**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BUILDING OWNERS AND MANAGERS | ) | |
| ASSOCIATION OF CHICAGO, | ) | |
| | ) | Case No. 19-cv-7212 |
| Plaintiff, | ) | |
| v. | ) | Honorable Thomas M. Durkin |
| | ) | |
| THE CITY OF CHICAGO, | ) | Magistrate Judge Sunil R. Harjani |
| Defendant | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**
**PLAINTIFF'S COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**......................................................................................................... 1

**SUMMARY OF ORDINANCE** .................................................................................... 2

**ARGUMENT** ................................................................................................................. 4

   I.   The Ordinance Is Not Preempted By The NLRA. ................................................. 4

       A.   The Ordinance is not preempted under Garmon. ......................................... 4

       B.   The Ordinance is not preempted under Machinists. ..................................... 5

   II.   The Ordinance Does Not Violate Equal Protection. .......................................... 10

   III.  The Ordinance Is A Valid Exercise Of The City's Home Rule Power. ............................ 14

       A.   Workplace scheduling legislation is within the City's home rule authority.............. 15

       B.   Creating a private right of action is within the City's home rule authority................ 17

**CONCLUSION** ............................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

520 South Michigan Ave. Associates, Ltd. v. Shannon, 549 F.3d 1119 (7th Cir. 2008) ..... 6, 8, 10

Abbasi ex rel. Abbasi v. Paraskevoulakos, 187 Ill.2d 386 (Ill. 1999) ......................................... 19

Al's Serv. Ctr. v. BP Prod. No. Am., Inc., 599 F. 3d 720 (7th Cir. 2010)................................... 14

Am. Freedom Def. Initiative v. Lynch, 217 F.Supp.3d 100 (D.D.C. Nov. 9, 2016) ................... 18

Am. Hotel and Lodging Ass'n v. City of Los Angeles, 834 F. 3d 958 (9th Cir. 2016).......... 5, 7, 9

Bremen Comty. High Sch. Dist. No. 228 v. Cook Cnty. Com'n on Human Rights, 2012 IL App
   (1st) 112177 ..................................................................................................................... 16, 17

California Grocers Ass'n v. City of Los Angeles, 52 Cal. 4th 177 (2011).................. 7, 11, 12, 14

City of Chicago v. Roman, 184 Ill. 2d 504 (1998) ....................................................................... 19

City of Evanston v. Create, Inc., 85 Ill. 2d 101 (Ill. 1981) ........................................................... 16

City of New Orleans v. Dukes, 427 U.S. 297 (1976) .................................................................... 10

Clackamas Gastroenterology Assocs., P. C. v. Wells, 538 U.S. 440 (2003)................................ 12

Concerned Home Care Providers, Inc. v. Cuomo, 783 F. 3d 77 (2d Cir. 2015).................... 5, 7, 9

Consol. Coal Co. of St. Louis v. People of State of Illinois, 185 U.S. 203 (1902)...................... 11

Crawford v. City of Chicago, 304 Ill. App. 3d 818 (1st Dist. 1999) ............................................ 17

Dandridge v. Williams, 397 U.S. 471 (1970) ............................................................................... 13

Dig. Recognition Network, Inc. v. Hutchinson, 803 F.3d 952 (8th Cir. 2015) ........................... 18

FCC v. Beach Commc'ns, Inc., 508 U.S. 307 (1993)............................................................. 10, 13

Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987) ....................................................... passim

Fortuna Enter., L.P. v. City of Los Angeles, 673 F. Supp. 2d 1000 (C.D. Cal. 2008) ..... 10, 11, 13

Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608 (1986) ................................ 5, 6

Hearne v. Bd. of Ed. of the City of Chicago, 185 F. 3d 770 (7th Cir. 1999)................................ 11

Hope Clinic v. Ryan, 249 F. 3d 603 (7th Cir. 2001).............................................................. 17, 18

K.P. v. LeBlanc, 729 F.3d 427 (5th Cir. 2013).............................................................................. 18

Kalodimos v. Vill. of Morton Grove, 103 Ill.2d 483 (Ill. 1984).................................................. 15

Livadas v. Bradshaw, 512 U.S. 107 (1994) .................................................................................... 9

LMP Services, Inc. v. City of Chicago, 2017 IL App (1st) 163390 .............................................. 17

Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S. 132 (1976) ......................... 4

McGowan v. State of Md., 366 U.S. 420 (1961) ........................................................ 12

McLean v. Arkansas, 211 U.S. 539 (1909)............................................................... 11

Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724 (1985).................................. 4, 5, 6, 8

Muskrat v. United States, 219 U.S. 346 (1911) .......................................................... 18

Nat'l Broad. Co., Inc. v. Bradshaw, 70 F. 3d 69 (9th Cir. 1995)......................................... 7, 8, 10

Nat'l Paint & Coatings Ass'n v. City of Chicago, 45 F. 3d 1124 (7th Cir. 1995)....................... 11

Page v. City of Chicago, 299 Ill. App. 3d 450 (1st Dist. 1998).................................... 17

Palm v. 2800 Lake Shore Drive Condo. Ass'n, 2013 IL 110505 ........................................ 15, 17

Palm v. 2800 Lake Shore Drive Condo. Ass'n, 401 Ill. App. 3d 868 (1st Dist. 2010) ............... 19

Park Pet Shop, Inc. v. City of Chicago, 872 F. 3d 495 (7th Cir. 2017) ........................................ 16

People v. Reed, 148 Ill. 2d 1 (Ill. 1992)................................................................ 10

Pontarelli Limousine, Inc. v. City of Chicago, 929 F.2d 339 (7th Cir. 1991) ............................ 11

Restaurant Law Center v. City of New York, 360 F. Supp. 3d 192 (S.D.N.Y. 2019)............ 7, 8, 9

Rhode Island Hospitality Ass'n v. City of Providence, 667 F. 3d 17 (1st Cir. 2011) ............... 7, 9

Rosario v. Ret. Bd. of Policemen's Annuity Fund, 2013 WL 842651 (N.D. Ill. Mar. 6, 2013) ... 10

RUI One Corp. v. City of Berkley, 371 F. 3d 1137 (9th Cir. 2004) ............................................ 11

San Diego Bldg. Trades Council, Millmen's Union, v. Garmon, 359 U.S. 236 (1959)................. 4

Scadron v. City of Des Plaines, 153 Ill. 2d 164 (Ill. 1992).......................................... 15

U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166 (1980)........................................................ 12

Viceroy Gold Corp. v. Aubry, 75 F. 3d 482 (9th Cir. 1996) .................................... 10, 13

Washington Serv. Contractors Coal. v. District of Columbia, 54 F. 3d 811 (D.C. Cir. 1995)5, 7, 8

Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483 (1955) .................................... 13

Woodfin Suite Hotels, LLC v. City of Emeryville, 2006 WL 2739309 (N.D. Cal. 2006)........... 12

## INTRODUCTION

Plaintiff is an organization that represents office building owners and managers, as well as companies that provide janitorial, security, and other services to those buildings.  Plaintiff challenges the City's Fair Workweek Ordinance ("Ordinance").  The Ordinance is intended to "provide the working people of Chicago with protections that ensure employer scheduling practices do not unreasonably prevent workers from attending to their families, health, education, and other obligations."  Ordinance (Ex. A hetero) § 1-25-010(ii).  To this end, the Ordinance requires employers to provide advance notice of work schedules to employees, and allows employees to decline new shifts or receive appropriate compensation when schedules are changed without sufficient notice.  The Ordinance applies to employees who earn modest incomes in seven industries prone to late-notice schedule changes.  It is precisely those employees who can least afford to bear the costs of finding last-minute child care, missing doctor's appointments, and otherwise reordering their lives when schedules are changed.[1]

Plaintiff fails to state any claim against the Ordinance.  The Ordinance is not preempted by the National Labor Relations Act because the Ordinance does not interfere with the mechanics of collective bargaining negotiations between labor and management.  It simply establishes minimum workplace standards, and therefore is of a piece with a variety of workplace regulations, such as mandated employee benefits packages, minimum wages, time off requirements, and severance pay that courts have long upheld as valid exercises of the police power to protect worker health and welfare.  Nor does the Ordinance violate equal protection

---

[1] See Daniel Schneider & Kristen Harknett, *Consequences of Routine Work-Schedule Instability for Worker Health and Well-Being*, American Sociological Review, Vol. 84 (1) 82 (2019), at 83 (unpredictable employment "most dramatically affects workers in low-wage occupations"); id. at 107 (workers with unpredictable schedules "experience a great deal of conflict between work demands and personal life, which depresses well-being").

even though it applies to employers of a certain size in certain industries, and allows parties to a collective bargaining agreement to waive the Ordinance's requirements. The City may choose to regulate those businesses that the City believes most warrant the Ordinance's protections, and the lines drawn by the Ordinance easily satisfy minimal rational basis review. Finally, the Ordinance is a valid exercise of the City's home rule authority under the Illinois Constitution because the impact of schedule changes by large employers on Chicago residents and their families is an important local concern. For these reasons and others discussed below, the Complaint should be dismissed in its entirety.

## SUMMARY OF ORDINANCE

The Ordinance covers businesses that are primarily engaged in the following seven industries: (1) building services; (2) healthcare; (3) hotels; (4) manufacturing; (5) restaurants; (6) retail; and (7) warehouse services. Ordinance § 1-25-020 (definitions of Covered Industry and Employer). Within these industries, the Ordinance applies to businesses that have, on a global basis, 100 or more employees, 50 of whom are Covered Employees. Id. § 1-25-020 (definition of Employer).[2] In general, a Covered Employee (hereafter "employee") is one who "spends the majority of their time at work for that employer while physically present within the City of Chicago," "performs the majority of their work in a Covered Industry for that employer," and earns $50,000 or less per year as a salaried employee, or $26.00 or less per hour as an hourly employee, from that employer. Id. § 1-25-020 (definition of Covered Employee).

For new employees, the Ordinance requires employers to provide a written good faith estimate of the employee's projected work days and hours for the first 90 days of employment.

---

[2] If the business is a not-for-profit corporation, the Ordinance applies if the business has 250 or more employees globally.

Ordinance § 1-25-040(a). As to other employees, employers are to post a notice listing each employee's weekly work schedule at least 10 days before the start of a new schedule. Id. § 1-25-040(b)(1).[3] If the employer wishes to add hours after posting the 10-day notice, the employee may decline to work the new hours. Id. § 1-25-050(a). Also, if the employer alters a schedule after the 10-day notice, the employee is to receive one hour of additional pay per shift in which the employer adds hours, reschedules a shift with no loss in hours, or reduces hours from a shift with more than 24-hours notice. Id. § 1-25-050(b). If hours are reduced with less than 24-hours notice, the employee is entitled to 50% of her regular rate of pay for those hours. Id.[4]

Additional shifts are to be offered first to qualified employees, and then to temporary or seasonal workers who have been with the employer for two or more weeks. Id. § 1-25-060(a). An employee may decline to work hours that arise less than 10 hours after the end of the previous day's shift. Id. § 1-25-070. If an employee works those hours, the employee is entitled to 1.25 time the employee's regular rate of pay for that shift. Id.

The Ordinance states that it shall not be deemed "to affect the validity or change the terms of bona fide collective bargaining agreements in force" on the effective date of the Ordinance (which is July 1, 2020), and that, after the effective date, the Ordinance's requirements may be waived in a bona fide collective bargaining agreement. Id. § 1-25-030. An employee may file a civil lawsuit seeking redress for violations of the Ordinance after first pursuing a dispute resolution process overseen by the City's Department of Business Affairs and Consumer Protection. Id. §1-25-140.

---

[3] In July 2022, the 10-day notice period becomes a 14-day period. Ordinance § 1-25-040(b)(1).

[4] There are exceptions to these requirements. Id. § 1-25-050(d). For instance, they do not apply when employees agree to swap shifts; when employees and employers agree to a change; when hours are reduced for disciplinary reasons; or when certain business dynamics are in play, such as when production needs to be delayed due to a customer request or the inability to acquire necessary production materials. Id.

**ARGUMENT**

**I.      The Ordinance Is Not Preempted By The NLRA.**

In Count I, Plaintiff claims that the Ordinance is preempted by the National Labor Relations Act, 29 U.S.C. § 151 et seq.  The NLRA does not contain language expressly preempting state or local laws, but the Supreme Court has recognized two forms of implicit preemption under the NLRA:  "Garmon" preemption, see San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236 (1959), and "Machinists" preemption, see Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S. 132 (1976).  See generally Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 747-51 (1985) (summarizing the two preemption doctrines).   Neither version of preemption applies here.

**A.      The Ordinance is not preempted under Garmon.**

Garmon preemption prevents local regulation of labor practices that are expressly protected under section 7 of the NLRA, or designated as unfair under section 8.  See Garmon, 359 U.S. at 244-46.  See also Metropolitan Life, 471 U.S. at 749; Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 22 n.16 (1987).  Here, section 7 is the only NLRA provision cited by Plaintiff as preempting the Ordinance.  See Compl. ¶ 45.  Section 7 protects the rights of employees to form unions, bargain collectively, and engage in related activities.  It states, in full, that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."  29 U.S.C. § 157.

The Ordinance does not regulate the labor practices protected by section 7. It in no way restricts employees from self-organizing, forming or assisting unions, or bargaining collectively through chosen representatives. The Ordinance simply imposes on employers certain requirements concerning the notice and changing of work schedules. Section 7 does not address these subjects at all. Count I should therefore be dismissed to the extent that it asserts Garmon preemption. See Metropolitan Life, 471 U.S. at 749 (concluding that Garmon preemption was inapplicable to state statute requiring certain health benefits because "the [NLRA] is silent as to the substantive provisions of welfare-benefit plans"); Fort Halifax, 482 U.S. at 22 n.16.

### B. The Ordinance is not preempted under Machinists.

Unlike Garmon preemption's focus on matters expressly regulated by the NLRA, Machinists preemption prohibits regulation of matters that Congress intended to be "unregulated because [they should be] left to be controlled by the free play of economic forces." Fort Halifax, 482 U.S. at 20-21 (citation omitted). It thus prevents interference with the "economic weapons of self-help" that either side to a labor dispute may use during the bargaining process, such as strikes, picketing, and lockouts. Id. at 20. See also Am. Hotel and Lodging Ass'n v. City of Los Angeles, 834 F. 3d 958, 963 (9th Cir. 2016). Put another way, Machinists preemption protects the "mechanics" of labor dispute resolution. Concerned Home Care Providers, Inc. v. Cuomo, 783 F. 3d 77, 86 (2d Cir. 2015). See also Washington Serv. Contractors Coal. v. District of Columbia, 54 F. 3d 811, 817-18 (D.C. Cir. 1995). For example, in Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608 (1986), the Supreme Court found a Machinists violation when Los Angeles required a taxi company to settle a strike with its drivers in order to have its operating franchise extended by the city. Refusing to extend the franchise unless the company

settled the strike "denied the company an essential weapon of economic strength – the ability to wait out a strike." Id. at 611-12, 615.

Importantly, however, this protection of bargaining mechanics does not prevent state and local legislatures from enacting substantive minimum labor standards. See Fort Halifax, 482 U.S. at 20; 520 South Michigan Ave. Associates, Ltd. v. Shannon, 549 F.3d 1119, 1129 (7th Cir. 2008). Indeed, "States possess broad authority under their police powers to regulate the employment relationship to protect workers," with "[c]hild labor laws, minimum and other wage laws, laws affecting occupational health and safety [being] only a few examples." Metropolitan Life, 471 U.S. at 756 (citation omitted). And because establishing labor standards "falls within the traditional police power of the State," preemption "should not be lightly inferred in this area." Fort Halifax, 482 U.S. at 21. Thus, in Metropolitan Life, the Supreme Court upheld a state law whose effect was to require employers to include specified mental health care benefits in their employee benefit plans. And in Fort Halifax, the Court upheld a law requiring employers who closed or relocated a plant with 100 or more employees to provide a specified amount of severance pay to employees who worked for more than 3 years. Laws like these are not preempted under Machinists because they "affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA." Metropolitan Life, 471 U.S. at 755. Minimum labor standards are "independent of the collective bargaining process [and] devolve on [employees] as individual workers, not as members of a collective organization." Id. (citation omitted).

The Ordinance is precisely this kind of permissible labor standard. It does not regulate the collective bargaining process, but merely contains minimum workplace scheduling requirements that apply to individuals as employees. And the Ordinance fits quite comfortably

6

within the larger body of minimum labor standards that have been upheld by courts around the country.  These include minimum wage and time-off requirements, <u>see</u> <u>American Hotel</u>, 834 F. 3d at 965, <u>and</u> <u>Concerned Home Care Providers</u>, 783 F. 3d at 85-87; minimum rates of overtime pay, <u>see</u> <u>Nat'l Broad. Co., Inc. v. Bradshaw</u>, 70 F. 3d 69 (9th Cir. 1995); requirements that employers hire their predecessors' employees for a period of 90 days, <u>see</u> <u>Rhode Island Hospitality Ass'n v. City of Providence</u>, 667 F. 3d 17, 32-33 (1st Cir. 2011), <u>California Grocers Ass'n v. City of Los Angeles</u>, 52 Cal. 4th 177, 199-208 (2011), <u>and</u> <u>Washington Service</u>, 54 F. 3d at 818; and a requirement that employers administer a payroll deduction system that allows employees to designate a portion of their pay to go to certain nonprofits, <u>see</u> <u>Restaurant Law Center v. City of New York</u>, 360 F. Supp. 3d 192, 236-39 (S.D.N.Y. 2019).

Plaintiff contends that the Ordinance is invalid because it "is not a law of general application."  Compl. ¶ 41.  But the Ordinance applies to seven industries, which are broadly defined.  For instance, "building services" means "the care and maintenance of property, including, but not limited to, janitorial services, building maintenance services, and security services."  Ordinance § 1-25-020.  "Manufacturing" means "the production of tangible goods for use from raw or prepared materials by giving the materials new forms, qualities, properties, or combinations, whether by hand-labor or machines."  <u>Id.</u>  And "retail" means "the sale to end users of tangible products that are primarily for personal, household, or family purposes, including, but not limited to, appliances, clothing, electronics, groceries, and household items."  <u>Id.</u>  The Ordinance is therefore far more general than laws that apply only to a single or a few industries but have nonetheless been upheld.  <u>See</u> <u>American Hotel</u>, 834 F. 3d at 960 (hotel workers); <u>Concerned Home Care Providers</u>, 783 F. 3d at 80 (home health care providers); <u>Rhode Island Hospitality Association</u>, 667 F. 3d at 32 (hospitality industry); <u>Washington Service</u>, 54 F.

3d at 814 (food, janitorial, maintenance, or nonprofessional health care industries); Bradshaw, 70 F. 3d at 69 (broadcast industry); Restaurant Law Center, 360 F. Supp. 3d at 236-39 (fast-food industry).[5]  Indeed, in applying to employers with 100 or more workers *overall*, it is broader than the plant closure law upheld in Fort Halifax, which applied when there were 100 employees at a *single plant*.

Plaintiff also argues that Ordinance improperly intrudes into the collective bargaining process because it requires employers to provide benefits that employees would otherwise have to bargain for during negotiations.  See Compl. ¶¶ 42-45.  This is a non-starter.  As the Supreme Court explained, "[t]he NLRA is concerned primarily with establishing an equitable *process* for determining the terms and conditions of employment, and not with the particular *substantive* terms of the bargain that is struck when the parties are negotiating from relatively equal positions."  Metropolitan Life, 471 U.S. at 753 (emphasis added).  Accordingly, labor standards are not preempted even though they "give[] employees something for which they otherwise might have to bargain," Fort Halifax, 482 U.S. at 21, and thereby remove the subject from "the free play of economic forces," Metropolitan Life, 471 U.S. at 748.  Indeed, "any state law that substantively regulates employment conditions" does that.  Fort Halifax, 482 U.S. at 21.  Even so, these laws are valid because they "do[] not limit the rights of self-organization or collective bargaining protected by the NLRA," Metropolitan Life, 471 U.S. at 757, but rather simply establish a "backdrop" of rights for negotiations between labor and management.  Fort Halifax,

---

[5] To be sure, in 520 South Michigan, the Seventh Circuit concluded that an Illinois break period law was too narrow to constitute a valid minimum labor standard.  But that law was an amendment to Illinois' general law governing workplace breaks, and it required additional break periods for one particular class of employee (hotel room attendants) within one industry (hotels) within one geographical subdivision (Cook County) of the enacting jurisdiction (Illinois).  See 549 F.3d at 1130.  The Ordinance is worlds away from that laser-focused amendment.

482 U.S. at 21.  In short, "the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption, for there is nothing in the NLRA which expressly forecloses all state regulatory power with respect to those issues that may be the subject of collective bargaining."  Id. at 21-22 (internal quotations and citation omitted).  See also Concerned Home Care, 783 F. 3d at 86 (law not preempted even though "[b]y setting a total compensation floor, the Law may affect the package of benefits over which employers and employees can negotiate"); Rhode Island Hospitality Ass'n, 667 F. 3d at 32 (ordinance not preempted even though it "provid[ed] the employees with benefits for which they otherwise would have had to bargain"); Restaurant Law Center, 360 F. Supp. 3d at 237, 238 (rejecting argument that law "places a thumb on the scale as to a substantive term of an agreement," because law "[did] not regulate or interfere with the collective bargaining process").

The above precedent is enough to reject Plaintiff's challenge.  But if anything more were needed, the Ordinance allows employers to opt out of its requirements by negotiating a waiver of the Ordinance in a collective bargaining agreement.  See Ordinance § 1-25-030.  Opt-out provisions like this allow parties to negotiate their own terms on an issue, and thus "strengthen[] the case that the statute works no intrusion on collective bargaining."  Fort Halifax, 482 U.S. at 22.  Indeed, many labor standards are mandatory across the board, yet are still upheld, and if "[i]f a statute that permits *no* collective bargaining on a subject escapes NLRA pre-emption, surely one that permits such bargaining cannot be pre-empted."  Id. (citation omitted).  Accordingly, courts have upheld minimum labor standard laws that contain waiver provisions like section 1-25-030.  See American Hotel, 834 F. 3d at 962, 965 ("the NLRA 'cast[s] no shadow on the validity of these familiar and narrowly-drawn opt-out provisions'") (quoting Livadas v. Bradshaw, 512 U.S. 107, 132 (1994)); Viceroy Gold Corp. v. Aubry, 75 F. 3d 482, 489-91 (9th

9

Cir. 1996); Bradshaw, 70 F. 3d at 71-73; Fortuna Enter., L.P. v. City of Los Angeles, 673 F. Supp. 2d 1000, 1003, 1012-13 (C.D. Cal. 2008).[6]  For all of these reasons, the Ordinance is not preempted by the NLRA, and Count I should be dismissed.

## II.     The Ordinance Does Not Violate Equal Protection.

In Counts II and III, Plaintiff argues that the Ordinance violates the federal and state Equal Protection Clauses, respectively.  Plaintiff complains that the Ordinance applies only to employers in certain types of industries with workforces of a certain size and composition.  See Comp. ¶¶ 49, 54.  Plaintiff also objects that the Ordinance does not apply to employers who use the opt out clause to negotiate a waiver of the Ordinance.  See id. ¶¶ 50, 55.  Neither distinction violates equal protection.

Because the Ordinance regulates economic activity, and does not implicate a suspect class or a fundamental right, it is subject to mere rational basis review.  See FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993).[7]  That standard is "a paradigm of judicial restraint," id. at 314, and recognizes that the City is "accorded wide latitude" in the regulation of its "local econom[y]," City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976).  Under rational basis review, distinctions drawn by the City bear "a strong presumption of validity" and "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  Beach, 508 U.S. at 313-14.  Courts are not to judge the "wisdom, fairness, or logic" of the Ordinance's distinctions, id. at 313, and defer to "the [City's] answer"

---

[6]  The ability to opt out of the Ordinance is another critical difference between the Ordinance and the amendment invalidated in 520 South Michigan.  Indeed, the Seventh Circuit expressly based its preemption finding on the amendment's lack of an opt-out provision.  See 549 F.3d at 1134.

[7]  The equal protection analysis here is the same under both the federal and state Constitutions. See People v. Reed, 148 Ill. 2d 1, 7 (Ill. 1992); Rosario v. Ret. Bd. of Policemen's Annuity Fund, 2013 WL 842651, at *7 (N.D. Ill. Mar. 6, 2013).

as to how best to regulate, Nat'l Paint & Coatings Ass'n v. City of Chicago, 45 F. 3d 1124, 1127 (7th Cir. 1995). Courts invalidate only those approaches that stem from "sheer senselessness." Pontarelli Limousine, Inc. v. City of Chicago, 929 F.2d 339, 343 (7th Cir. 1991).

Here, the Ordinance's application to employers with 100 or more employees easily satisfies rational basis review. The Supreme Court has long upheld size-based workplace classifications against equal protection challenge, see Consol. Coal Co. of St. Louis v. People of State of Illinois, 185 U.S. 203, 207-8 (1902) (law exempting coal mines employing no more than five employees); McLean v. Arkansas, 211 U.S. 539, 551-2 (1909) (law applying to mines employing ten or more employees), as have other courts, see RUI One Corp. v. City of Berkley, 371 F. 3d 1137, 1154-56 (9th Cir. 2004) (living wage and time off law that applied to employers with more than 5 employees and $350,000 in annual receipts within a defined marina zone); Hearne v. Bd. of Ed. of the City of Chicago, 185 F. 3d 770, 774-75 (7th Cir. 1999) (teacher employment protection law based on size of employing school district); Fortuna, 673 F. Supp. 2d at 1014 (living wage and time off law applying to hotels with 50 or more guest rooms near airport); California Grocers, 52 Cal. 4th at 210 (worker retention law for grocery stores larger than 15,000 square feet). Indeed, workplace regulations exempting smaller firms are commonplace in some of the Nation's most prominent laws. See Title VII of the Civil Right Act of 1964, 42 U.S.C. §§ 2000e(b) (defining "employer" as a "person engaged in an industry affecting commerce who has fifteen or more employees…."); the Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (providing a similar definition); the Age Discrimination in Employment Act, 29 U.S.C. §§ 630(b) (defining an "employer" as a person employing at least 20); the Patient Protection and Affordable Care Act, 26 U.S.C. § 4980H (defining an "applicable large employer" as an employer with at least 50 full-time employees).

11

There are various rational reasons for applying the Ordinance to larger employers. For one, because they employ more workers than smaller companies, their scheduling and pay practices impact a greater number of Chicagoans, and, consequently, have a greater impact on Chicago families and the City's economy. See California Grocers, 52 Cal. 4th at 210 (city could rationally conclude "that disruptions at larger stores, involving larger workforces, would have a larger impact on the community"). Moreover, larger firms are more able to absorb the costs of implementing workplace regulations. See Clackamas Gastroenterology Assocs., P. C. v. Wells, 538 U.S. 440, 447 (2003) (intent of ADA's small employer exemption was to "eas[e] entry into the market and preserv[e] the competitive position of smaller firms"); Woodfin Suite Hotels, LLC v. City of Emeryville, 2006 WL 2739309, at *21 (N.D. Cal. Aug. 23, 2006) (hotels with 50 or more rooms "are better able to afford the proposed conditions," and "are generally less likely to respond by closing or reducing employment"); California Grocers, 52 Cal. 4th at 210 ("larger stores would be more readily positioned to absorb any short-term burdens the Ordinance's requirements might impose on employers").

Similarly, it is rational for the Ordinance to apply only to covered employees in certain industries. Legislatures have broad discretion in deciding which types of entities and employees are covered by their statutes. See McGowan v. State of Md., 366 U.S. 420 (1961) (upholding exemption of certain business types from Sunday closure laws); U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 177 (1980) (upholding law providing "windfall benefits" to some railroad employees, and not others). Here, the City Council could reasonably conclude that the particular industries covered by the Ordinance – building services, healthcare, hotels, manufacturing, restaurants, retail, and warehouse services – are, given the nature of their business, likely to have the kinds of fluctuation in demand for employee hours or shifts that the Ordinance is intended to ameliorate.

12

Likewise, the City Council could rationally assume that covered employees – those generally making less than $50,000 a year or $26.00 an hour – are more likely than other employees to suffer the economic and family impacts from late schedule changes and to benefit from the protections in the Ordinance.

While some may argue that more or fewer business types should be included in the Ordinance, or that its business size and wage thresholds should be raised or lowered, an ordinance does not violate equal protection "merely because the classifications [ ] are imperfect." Dandridge v. Williams, 397 U.S. 471, 485 (1970). "Defining the class of persons subject to a regulatory requirement" is an "unavoidable component[] of most economic legislation," since the government must "draw the line somewhere." Beach, 508 U.S. at 315-16. And legislatures "must be allowed leeway to approach a perceived problem incrementally," id. at 316, such that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1955).

Finally, the Ordinance does not violate equal protection by allowing an employer and union to opt-out of the law's requirements by waiving them in a bona fide collective bargaining agreement. See Ordinance § 1-25-030. It is rational for the Ordinance not to apply to workers who opt out via collective bargaining, because those workers have the ability, through their collective bargaining agreement, to secure sufficiently protective terms governing scheduling and wages. See Viceroy, 75 F. 3d at 491 (rejecting equal protection challenge to opt-out provision in law governing shift length for mining workers, because workers covered by a collective bargaining agreement "have greater power to ensure safe working conditions than [non-union] workers"); Fortuna, 673 F. Supp. 2d at 1014. Moreover, opt out provisions are a

reasonable way "to balance the desirability of a particular substantive labor standard against the right of self-determination regarding the terms and conditions of employment," Fort Halifax, 482 U.S. at 22, and, as explained supra at 8-9, they reduce the likelihood that a law will be found to run afoul of NLRA preemption principles.  See also California Grocers, 52 Cal. 4th at 211 (opt-out provisions are "rationally related to the desire to enact valid (nonpreempted) legislation"). For all these reasons, Counts I and II should be dismissed.

**III.**     **The Ordinance Is A Valid Exercise Of The City's Home Rule Power.**

In Count IV, Plaintiff contends that the Ordinance exceeds the City's home rule authority under Article VII, section 6(a) of the Illinois Constitution.  Plaintiff argues that the Ordinance is outside home rule authority because it regulates "employment terms and conditions," a matter of statewide rather than local concern.  Compl. ¶ 59.  Plaintiff also contends that the Ordinance exceeds the City's home rule authority to the extent that it creates a private right of action in state court allowing for damages, litigation costs, expert fees, and attorney's fees.  Id. ¶ 60.

The Court should relinquish supplemental jurisdiction over this state law claim if it dismisses Plaintiff's federal claims.  See Al's Serv. Ctr. v. BP Prod. No. Am., Inc., 599 F. 3d 720, 727 (7th Cir. 2010).  But Count IV also fails on the merits.

The Illinois Constitution's grant of home rule authority is vast.  It states that a home rule municipality "may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare[.]"  Ill. Const., art. VII, § 6(a).  The Constitution further requires that the "powers and functions of home rule units shall be construed liberally."  Id. § 6(m).  The Constitution was intended to give home rule units "the broadest powers possible" to

regulate matters pertaining to local concerns.  Scadron v. City of Des Plaines, 153 Ill. 2d 164, 174 (Ill. 1992).

An ordinance is a valid exercise of municipal home rule authority so long as it (1) regulates a matter that falls within the scope home rule authority and (2) the Illinois legislature has not preempted home rule authority over the subject, which it does by enacting a statute specifically stating that it is preempting home rule.  See Palm v. 2800 Lake Shore Drive Condo. Ass'n, 2013 IL 110505, ¶¶ 35-36.  Plaintiff does not allege that an Illinois statute specifically preempts the Ordinance.  Rather, Plaintiff argues that the Ordinance fails at the first step – it falls outside the City's home rule authority because it does not pertain to the City's government and affairs.  See Compl. ¶¶ 59, 60.  This fails to state a claim.

**A.** **Workplace scheduling legislation is within the City's home rule authority.**

Three factors are used to determine whether a subject pertains to a home rule city's government and affairs: "(1) the nature and extent of the problem, (2) the units of government which have the most vital interest in its solution, and (3) the role traditionally played by local and statewide authorities in dealing with it."  Kalodimos v. Vill. of Morton Grove, 103 Ill.2d 483, 501 (Ill. 1984).  Under these factors, the Ordinance's scheduling protections and other substantive provisions fall well within the City's home rule authority.

First, the Ordinance addresses a local problem: fair scheduling practices for "the working people of Chicago" so that they may "attend[] to their families, health, and education, and other obligations[.]"  Ordinance § 1-25-010.  The Ordinance covers employees who spend the majority of their time at work for an employer "while physically present" in the City, id. § 1-25-020, and it requires the City's Department of Business Affairs and Consumer Protection to study the law's effectiveness, allowing it to be further tailored over time to meet local needs, id. § 1-25-170.

15

The Ordinance is therefore aimed at matters of local concern.  See Bremen Comty. High Sch. Dist. No. 228 v. Cook Cnty. Com'n on Human Rights, 2012 IL App (1st) 112177, ¶ 46 (holding that ordinance pertained to county's government and affairs by prohibiting unlawful employment discrimination "when: (1) it relates to employment that is in whole or in part in Cook County; or (2) the act of unlawful discrimination takes place in Cook County").

Second, the City is the unit of government with the most vital interest in addressing uncertainty about work schedules at large employers.  Chicago is the State's most populous city and has the most employees and employers in the industries covered by the Ordinance.  The impact of workplace scheduling on worker finances, families, childcare, health, and education is therefore most acutely felt in Chicago.  See City of Evanston v. Create, Inc., 85 Ill. 2d 101, 113-14 (Ill. 1981)  (the "densely populated and highly urbanized" City of Evanston has a strong local interest in providing landlords and tenants "with a detailed description of their rights, duties, and remedies"); see also Park Pet Shop, Inc. v. City of Chicago, 872 F. 3d 495, 500 (7th Cir. 2017) (emotional health and financial costs incurred by Chicagoans in caring for sick and troubled pets are local concerns under Illinois home rule doctrine).  Indeed, as the framers of the home rule provision explained, "[a]lthough the problems of urban society affect many localities, they are felt most intensely in larger cities and villages.  Dense concentrations of population and industry call for the creative use of flexible government powers to achieve and maintain order, social justice and a satisfactory quality of life."  Create, Inc., 85 Ill. 2d at 113-14 (quoting 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1628-29).

Third, local governments have traditionally played a central role in addressing employee benefits and other employment terms, and courts have upheld local ordinances addressing those matters as valid exercises of home rule authority.  See Crawford v. City of Chicago, 304 Ill. App.

3d 818, 828 (1st Dist. 1999) (health benefits provided to employee's domestic partner); Bremen, 2012 IL App (1st) 112177, ¶ 45 (discrimination against employees); Page v. City of Chicago, 299 Ill. App. 3d 450, 459 (1st Dist. 1998) (harassment against employees). Like the benefit and workplace protections upheld in these cases, the Ordinance's scheduling requirements are fundamentally tied to the health, safety, and welfare of Chicago's workers – workers who generally have a higher cost of living than their rural counterparts and are thus more likely to take multiple jobs and face hardships arising from last-minute shift changes.

The Illinois General Assembly, for its part, has not expressed any vital interest or traditionally exclusive role in the area of predictable scheduling. Regardless, the fact that the state legislates in an area does not mean that municipal regulation in the same area is outside the scope of home rule authority. Home rule authorities "are free to carry on activities that relate to their communities *even if the state also is interested and active* in the area." Palm, 2013 IL 110505, ¶ 75 n.3 (emphasis in original) (quotations and citation omitted). They "act with the same powers as the state unless specifically limited by the General Assembly." LMP Services, Inc. v. City of Chicago, 2017 IL App (1st) 163390, ¶ 27, aff'd 2019 IL 123123.

For all these reasons, the Ordinance's scheduling provisions pertain to the City's government and affairs. Plaintiff's first home rule argument should therefore be dismissed.

**B.      Creating a private right of action is within the City's home rule authority.**

The Ordinance's private right of action is also within the City's home rule authority. As an initial matter, however, the challenge fails for lack of standing. "Article III does not permit the federal judiciary to determine the constitutionality of a statute providing for private litigation, when the . . . government (or its agents) are the only adverse parties to the suit." Hope Clinic v. Ryan, 249 F. 3d 603, 604 (7th Cir. 2001) (per curiam) (citing Muskrat v. United States, 219 U.S.

17

346 (1911)).  In <u>Hope Clinic</u>, abortion providers sued government agencies in challenging the constitutionality of Illinois and Wisconsin statutes prohibiting partial birth abortions.  The statutes authorized private causes of action for damages, but the Seventh Circuit held that the plaintiffs lacked standing to challenge those provisions.  The reason was a lack of both causation and redressability:  The governmental defendants "cannot cause the plaintiffs injury by enforcing the private-action statutes," and "any potential dispute plaintiffs may have with future private plaintiffs could not be redressed by an injunction running only against public prosecutors."  249 F. 3d at 605.  <u>See also</u> <u>Dig. Recognition Network, Inc. v. Hutchinson</u>, 803 F.3d 952, 957-58 (8th Cir. 2015); <u>K.P. v. LeBlanc</u>, 729 F.3d 427, 437 (5th Cir. 2013); <u>Am. Freedom Def. Initiative v. Lynch</u>, 217 F.Supp.3d 100, 105 (D.D.C. Nov. 9, 2016).  The Court added that hearing the claim would be "a flagrant violation of . . . the due process clause (for putative private plaintiffs are entitled to be notified and heard before courts adjudicate their entitlements)."  <u>Hope Clinic</u>, 249 F. 3d at 605.

The City, like the governmental bodies in <u>Hope Clinic</u>, is the only defendant here.   Any injury Plaintiff or its members may encounter from the Ordinance's private right of action would not be caused by the City and would arise only if and when employees, who are third parties not before this Court, choose to file a private enforcement action.   And an injunction against the City would not prevent future employees from initiating private actions under the Ordinance.  Plaintiff therefore lacks standing to challenge the Ordinance's private right of action provision.

The challenge also fails on the merits.  The home rule provisions in the Illinois Constitution make clear that the City has the authority to create a private right of action like that in the Ordinance.  After conferring the broad grant of home rule authority in section 6(a) of Article VII, section 6 goes on to precisely define the limits of that authority as it relates to the

establishment of offenses and penalties: section (d)(2) restricts home rule units from establishing felonies, and section (e)(1) bars home rule units from establishing terms of imprisonment longer than 6 months, unless so authorized by the legislature. Aside from these limitations, home rule authority remains open to define offenses and create causes of action to enforce them. Thus, in Roman, the Illinois Supreme Court upheld the City's home rule authority to enact an ordinance imposing a mandatory prison term of less than 6 months for an offense, and to enforce that penalty by suing in state court. See City of Chicago v. Roman, 184 Ill. 2d 504, 513-15 (1998). And if home rule allows a city to define and bring state court actions itself to enforce its laws, home rule also allows that city to authorize private parties to sue to vindicate those same interests. Indeed, in Palm v. 2800 Lake Shore Drive Condo. Ass'n, 401 Ill. App. 3d 868, 878 (1st Dist. 2010), aff'd 2013 IL 110505, the Illinois Appellate Court rejected a home rule challenge to a City ordinance allowing private parties to recover attorney's fees in private suits seeking enforcement of the City's condominium disclosure ordinance.[8] Indeed, private suits to enforce the City's laws relate to the City's local government and affairs just as much as suits by the City itself. They provide a supplemental means of securing compliance with the City's laws in cases where the City's own limited municipal resources may prevent it from suing, and they encourage workers, who are in the best position to know of and report a violation, to bring suit on their own behalf. Accordingly, the Ordinance's private right of action provision is a valid exercise of the City's home rule authority.

---

[8] Further, the Illinois Supreme Court in Palm upheld the disclosure ordinance against home rule challenge and affirmed the attorney's fees awarded pursuant to its private action provision without any suggestion that the provision was beyond the City's home rule authority. See also Abbasi ex rel. Abbasi v. Paraskevoulakos, 187 Ill.2d 386, 404 (Ill. 1999) (Harrison, J., dissenting) (explaining that "if the court reached this issue on the merits, as it should [have]," it would be required to hold that an ordinance providing for a private right of action is a lawful exercise of home rule authority).

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed in its entirety.

Date:   January 17, 2020                          Respectfully submitted,

ANDREW WORSECK                                    MARK A. FLESSNER,
andrew.worseck@cityofchicago.org                  Corporation Counsel for the City of Chicago
OSCAR PIÑA
oscar.pina@cityofchicago.org                      By:      /s/ Andrew Worseck
JORDAN A. ROSEN                                   Chief Assistant Corporation Counsel
jordan.rosen@cityofchicago.org
City of Chicago Department of Law
Constitutional and Commercial
  Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-7129 / 742-0797 / 744-9018

*Attorneys for Defendant*

# Exhibit A



# City of Chicago

## Office of the City Clerk

## Document Tracking Sheet



**SO2019-3928**

| | |
|---|---|
| **Meeting Date:** | 5/29/2019 |
| **Sponsor(s):** | Sadlowski Garza (10) |
| | Rodriguez (22) |
| | Villegas (36) |
| | Cardenas (12) |
| | Cardona, Jr. (31) |
| | Hadden (49) |
| | Hairston (5) |
| | Moore (17) |
| | Rodriguez Sanchez (33) |
| | Curtis (18) |
| | Martin (47) |
| | La Spata (1) |
| | Taliaferro (29) |
| | Burnett (27) |
| | Ervin (28) |
| | Maldonado (26) |
| | Mitts (37) |
| | Waguespack (32) |
| | Dowell (3) |
| | Tabares (23) |
| | Brookins (21) |
| | Ramirez-Rosa (35) |
| | Osterman (48) |
| | Sigcho-Lopez (25) |
| | Vasquez, Jr. (40) |
| | Austin (34) |
| | King (4) |
| | Silverstein (50) |
| | Taylor (20) |
| | Gardiner (45) |
| **Type:** | Ordinance |
| **Title:** | Amendment of Municipal Code Title 1 by adding new Chapter 1-25 entitled "Chicago Fair Workweek Ordinance" |
| **Committee(s) Assignment:** | Committee on Workforce Development |



CITY COUNCIL
July 24, 2019

To the President and Members of the City Council:

Your Committee on Workforce Development, to which was referred on May 29, 2019, an ordinance regarding an Amendment of the Municipal Code by adding new Chapter 1-25 entitled "Chicago Fair Workweek Ordinance," O2019-3928, begs leave to recommend that your Honorable Body **DO PASS** the substitute ordinance submitted herewith.

This recommendation was concurred in by all members of the committee present on July 23, 2019.

Respectfully submitted,

Susan Sadlowski-Garza
Chairwoman
Committee on Workforce Development

Committee on Workforce Development

<u>S U B S T I T U T E</u>
<u>O R D I N A N C E</u>

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:**

**SECTION 1.** Title 1 of the Municipal Code of Chicago is hereby amended by adding a new Chapter 1-25 as follows:

## CHAPTER 1-25 CHICAGO FAIR WORKWEEK ORDINANCE

**1-25-010  Purpose and Intent.**

This Chapter shall be known and may be cited as the "Chicago Fair Workweek Ordinance." It is the purpose of this Chapter and the policy of the City: (i) to enact and enforce fair and equitable employment scheduling practices in the City of Chicago; (ii) to provide the working people of Chicago with protections that ensure employer scheduling practices do not unreasonably prevent workers from attending to their families, health, education, and other obligations; and (iii) to require Employers needing additional hours, whether temporary or permanent, to first offer those hours to current part-time Covered Employees.

**1-25-020  Definitions.**

As used in this Chapter, the following terms shall have the following meanings:

"Banquet Event" means a catered event staffed by employees dedicated to the event and held at a hotel.  A banquet event is scheduled at the time that the customer provides a deposit in connection with a specific date.

"Building Services" means the care and maintenance of property, including, but not limited to, janitorial services, building maintenance services, and security services.  This definition does not include on-duty police officers or other government officials performing their official duties.

"Commissioner" means the Commissioner of Business Affairs and Consumer Protection or the Commissioner's designee.

"Covered Employee" means an individual who meets all of the following (a) through (d): (a) performs work for an employer in the capacity of (i) an employee, as distinguished from a contractor, determined pursuant to Internal Revenue Service guidelines, or (ii) a worker for a day and temporary labor service agency, as defined in the Day and Temporary Labor Services Act, 820 ILCS 175/5, who has been on assignment to the employer for 420 hours within an 18-

month period; (b) spends the majority of their time at work for that employer while physically present within the City of Chicago; (c) performs the majority of their work in a Covered Industry for that employer; and (d) earns less than or equal to $50,000 per year as a salaried employee, or less than or equal to $26.00 per hour as an hourly employee, from that employer. For Hotels, set service fees that an employee earns are included in the calculation of the stated hourly wage threshold. An employee who staffs a Banquet Event and receives a set gratuity for that work shall not be deemed to be a Covered Employee for purposes of that Banquet Event. The stated wage amounts in this definition shall be increased yearly from the previous year in proportion to an increase in the CPI. Any increase shall be rounded up to the nearest multiple of $0.05. Any increase shall remain in effect until any subsequent adjustment is made. On or before June 1, 2021, and on or before every June 1 thereafter, the Department shall make available to Employers a bulletin announcing the adjusted amount for the upcoming year.

"Covered Industry" means:
    (1)    Building Services;
    (2)    Healthcare;
    (3)    Hotels;
    (4)    Manufacturing;
    (5)    Restaurants;
    (6)    Retail; and
    (7)    Warehouse Services.

"CPI" means the Consumer Price Index for All Urban Consumers most recently published by the Bureau of Labor Statistics of the United States Department of Labor.

"Department" means the Department of Business Affairs and Consumer Protection.

"Dialysis Facility" means a facility that provides outpatient maintenance dialysis.

"Domestic Violence" means abuse, as defined in Section 103 of the Illinois Domestic Violence Act of 1986, 750 ILCS 60/101 *et seq*.

"Employer" means a person who meets all of the following: (a) employs, (i) globally, 100 or more employees, or in the case of not-for-profit corporations, 250 or more employees, (ii) 50 of whom are Covered Employees; and (b) is primarily engaged in a Covered Industry. Numbers of Covered Employees will be aggregated if they are employed by members of a single unitary business group. For purposes of this subsection, the term "unitary business group" is as defined for Illinois income tax purposes.

"Family member" shall have the definition applied to that term in Section 1-24-010.

"Healthcare" means: (i) health care services or long-term care services that require licensure under one of the following Illinois licensing acts: the Hospital Licensing Act, the Nursing Home Care Act, the Specialized Mental Health Rehabilitation Facilities Act, the Assisted Living and Shared Housing Act, the Life Care Facilities Act, the Ambulatory Surgical Treatment Center Act, or licensure as a Freestanding Emergency Center under the Emergency Medical Services Systems Act, or (ii) dialysis services provided by a Dialysis Facility.

"Hotel" shall have the definition applied to that term in Section 4-6-180.

"Manufacturing" means the production of tangible goods for use from raw or prepared materials by giving the materials new forms, qualities, properties, or combinations, whether by hand-labor or machines.

"Person" shall have the definition applied to that term in Section 1-4-090(e).

"Predictability Pay" means wages paid to a Covered Employee, calculated on an hourly basis at the Employee's regular rate as compensation for schedule changes made by an Employer to a Covered Employee's schedule pursuant to this Chapter, in addition to any wages earned for work performed by that Employee.

"Regular rate" shall have the definition applied to that term in 29 U.S.C. § 207(e).

"Restaurant" means any business licensed to serve food in the City of Chicago which also has, globally, at least 30 locations and at least 250 employees in the aggregate. The term "Restaurant" shall not include businesses limited to three or fewer locations in the City that are owned by one Employer and operating under a sole franchise.

"Retail" means the sale to end users of tangible products that are primarily for personal, household, or family purposes, including, but not limited to, appliances, clothing, electronics, groceries, and household items.

"Self-schedule" means the practice of an employee to self-select work shifts without employer pre-approval pursuant to a mutually acceptable agreement.

"Sexual Violence" means any conduct proscribed by Article 11 of the Criminal Code of 2012, as well as the provisions in Article 12 related to stalking, 720 ILCS 5/12-7.3, 12-7.4, and 12-7.5.

"Shift" means the consecutive hours an Employer schedules a Covered Employee to work, including Employer-approved meal periods and rest periods.

"Ticketed Event" means a sporting, entertainment, civic, charitable or other event held at

a venue with a capacity of at least 5,000 people and that requires a ticket for admission. The form of the ticket may be electronic, physical, or as a name on a list held by the event's ticket auditor.

"Warehouse Services" means the storage of goods, wares, or commodities for hire or compensation, and, in connection with this operation, may include the loading, packing, sorting, stacking, wrapping, distribution, and delivery of those goods.

"Work Schedule" means all of a Covered Employee's shifts, including specific start and end times for each shift, during a calendar week.

"Writing" or "written" means a printed or printable communication in physical or electronic format including a communication that is transmitted through electronic mail, text message or a computer system or is otherwise sent and stored electronically.

**1-25-030  Application to Collective Bargaining Agreements.**

Nothing in this Chapter shall be deemed to interfere with, impede, or in any way diminish the right of employees to bargain collectively with their employers through representatives of their own choosing in order to establish wages or other conditions of work in excess of the applicable minimum standards of the provisions of this Chapter. Nothing in this Chapter shall be deemed to affect the validity or change the terms of bona fide collective bargaining agreements in force on the effective date of this Chapter. After the effective date of this Chapter, the requirements of this Chapter may be waived in a bona fide collective bargaining agreement, but only if the waiver is set forth explicitly in such agreement in clear and unambiguous terms.

**1-25-040  Advance Notice of Work Schedules.**

(a)　　Initial Estimate of Work Schedule.

　　(1)　　Prior to or on commencement of employment, an Employer shall provide every Covered Employee with a good faith estimate in writing of the Covered Employee's projected days and hours of work for the first ninety days of employment, including:

　　　　(A)　　The average number of weekly work hours the Covered Employee can expect to work each week;

　　　　(B)　　Whether the Covered Employee can expect to work any on-call shifts;

　　　　(C)　　A subset of days and a subset of times or shifts that the Covered Employee can expect to work, or days of the week and times or shifts on which the Covered Employee will not be scheduled to work. The good faith estimate is not a contractual offer binding the Employer, but an estimate made without a good faith basis is a violation of this section.

　　(2)　　Prior to or on commencement of employment, the Covered Employee

4

may request that the Employer modify the projected days and hours of work provided under Subsection (a)(1) of this section. The Employer shall consider any such request, and in its sole discretion may accept or reject the request, provided that the Employer shall notify the Covered Employee of Employer's determination in writing within three days of the request.

(b)     Advance Notice of Work Schedule.

(1)     An Employer shall provide its Covered Employees with written notice of work hours by posting the Work Schedule no later than 10 days before the first day of any new schedule from July 1, 2020, to June 30, 2022, and shall post the Work Schedule no later than 14 days before the first day of any new Work Schedule beginning July 1, 2022, by posting the Work Schedule within the unit or department or workgroup either in a conspicuous place at the workplace that is readily accessible and visible to all Covered Employees or using the usual methods of communication, or both. The written Work Schedule shall include the shifts and on-call status of all current Covered Employees at that worksite. Additionally, upon written request of a Covered Employee, an Employer shall transmit the Work Schedule by electronic means.

(2)     An Employer may change a Covered Employee's Work Schedule after it is posted and/or transmitted, up to the deadline articulated in Subsection (b)(1) without penalty. After that deadline, such changes shall be subject to the notice and compensation requirements set forth in this Chapter.

(3)     Covered Employees who Self-schedule or work in a venue that regularly hosts Ticketed Events shall not be bound by this Subsection (b), nor shall their Employers to the extent that the Covered Employee Self-schedules or works in a venue that regularly hosts Ticketed Events.

(4)     A Covered Employee who is a victim of Domestic Violence or Sexual Violence or who has a family or household member who is a victim may request that the Covered Employee's Work Schedule not be posted or transmitted to other employees. An oral or written request shall be sufficient and implemented immediately and is sufficient until the Covered Employee gives written permission to post the Covered Employee's schedule. An Employer may request a written statement from the Covered Employee that states that the Covered Employee is, or has a family or household member who is, a victim of Domestic Violence or Sexual Violence. The written statement shall constitute the documentation needed for the Employer to implement the request. The Employer may not require a written statement more than once in a calendar year from any Covered Employee for this purpose.


**1-25-050  Schedule Changes.**

(a)     *Right to decline.* Subject to the exceptions in Subsection (d) of this section, a Covered Employee has the right to decline any previously unscheduled hours that the Employer adds to the Covered Employee's schedule, and for which the Covered Employee has been provided advance notice of less than 10 days before the first day of any new schedule from July 1, 2020, to June 30, 2022, and less than 14 days before the first day of any new schedule

beginning July 1, 2022.

    (b)    *Alterations.*  Subject to the exceptions in Subsection (d) of this section, if an Employer alters a Covered Employee's Work Schedule after the deadline articulated in Section 1-25-040(b)(1), in addition to the regular rate of pay, the Covered Employee shall receive:

        (1)    One hour of Predictability Pay for each shift in which the Employer:

            (A)    adds hours of work.

            (B)    changes the date or time of a work shift with no loss of hours.

            (C)    with more than 24 hours' notice, cancels or subtracts hours from a regular or on-call shift.

        (2)    No less than 50% of the Covered Employee's regular rate of pay for any scheduled hours the Covered Employee does not work because the Employer, with less than 24 hours' notice subtracts hours from a regular or on-call shift or cancels a regular or on-call shift, including while the Covered Employee is working on a shift.

    (c)    The Employer shall amend the posted Work Schedule and transmit it to the Covered Employee in writing within 24 hours of a schedule change.

    (d)    *Exceptions.* The requirements of this section shall not apply in the following circumstances:

        (1)    A Work Schedule change because:

            (A)    of threats to Employers, Covered Employees, or property, or when civil authorities recommend that work not begin or continue;

            (B)    public utilities fail to supply electricity, water, or gas, or the sewer system fails to serve the location of work;

            (C)    of acts of nature (including, but not limited to, flood, earthquake, tornado, or blizzard);

            (D)    war, civil unrest, strikes, threats to public safety, or pandemics.

        (2)    A Work Schedule change that is the result of a mutually agreed upon shift trade or coverage arrangement between Covered Employees, subject to any existing Employer policy regarding required conditions for Covered Employees to exchange shifts;

        (3)    A Work Schedule change that is mutually agreed to by the Covered Employee and Employer and is confirmed in writing.

        (4)    A Covered Employee requests a shift change, that is confirmed in writing, including but not limited to use of sick leave, vacation leave, or other policies offered by the Employer.

        (5)    An Employer subtracts hours from a Work Schedule for disciplinary reasons for just cause, provided the Employer documents the incident leading to the Covered Employee's discipline in writing.

        (6)    A Banquet Event is scheduled or rescheduled under circumstances that

are outside the Employer's control, the attendee counts increase by more than 20%, or a new banquet event is scheduled within 48 hours of the event occurring, after the Employer provides the posted Work Schedule.

(7)     When, in Manufacturing, events outside of the control of the manufacturer result in a change in the need for Covered Employees, including, but not limited to, when a customer requests the manufacturer to delay production or there is a delay in the receipt of raw materials or component parts needed for production.

(8)     With regard to Healthcare Employers, in (i) any declared national, State, or municipal disaster or other catastrophic event, or any implementation of an Employer's disaster plan, or incident causing a hospital to activate its Emergency Operations Plan, that will substantially affect or increase the need for healthcare services; (ii) any circumstance in which patient care needs require specialized skills through the completion of a procedure; or (iii) any unexpected substantial increase in demand for healthcare due to large public events, severe weather, violence, or other circumstances beyond the Employer's control.

(9)     A Ticketed Event is cancelled, scheduled, rescheduled, postponed, delayed, increases in expected attendance by 20% or more, or increases in duration, due to circumstances that are outside the Employer's control.  Additional hours due to a change in a Ticketed Event's duration that fall within this exemption will also be fully exempt from this Section.

(10)     When Covered Employees Self-schedule.

## 1-25-060  Offer of Additional Work Hours to Existing Employees.

(a)     Subject to the limitations in this Chapter, when an Employer needs to fill additional shifts of work, the Employer shall first offer additional shifts of work to existing Covered Employees if the Covered Employees are qualified to do the additional work, as determined by the Employer.  If offered shifts are not accepted by Covered Employees, the shifts shall be offered to temporary or seasonal workers who have worked on behalf of the Employer for two or more weeks.

(b)     An Employer shall distribute additional shifts in compliance with Subsection (a), provided that:

(1)     the Employer's system for distribution of hours must not discriminate on the basis of race, color, creed, religion, ancestry, national origin, sex, sexual orientation, gender identity or expression, disability, age, or marital or familial status;

(2)     whenever practicable, the Employer shall first offer those hours to part-time Covered Employees.

(c)     This section shall not be construed to require any employer to schedule employees to work hours required to be paid at a premium rate.

7

**1-25-070  Right to Rest.**

(a)     A Covered Employee has the right to decline Work Schedule hours that are less than 10 hours after the end of the previous day's shift.

(b)     When a Covered Employee works a shift that begins less than 10 hours after the end of the previous day's shift, the Employer shall pay the Covered Employee at a rate of 1.25 times the Covered Employee's regular rate of pay for that shift.

**1-25-080  Right to Request a Flexible Working Arrangement.**

A Covered Employee has the right to request a modified Work Schedule, including, but not limited, to additional shifts or hours; changes in days of work; changes in shift start and end times; permission to exchange shifts with other employees; limitations on availability; part-time employment; job sharing arrangements; reduction or change in work duties; or part-year employment.

**1-25-090  Notice and Posting.**

(a)     Every Employer shall post in a conspicuous place in each facility where any Covered Employee works that is located within the geographic boundaries of the City a notice advising the Covered Employees of their rights under this Chapter.  The Commissioner shall prepare and make available a form notice that satisfies the requirements of this Subsection (a).

(b)     Every Employer shall provide with the first paycheck subject to this Chapter a notice advising the Covered Employee of their rights under this Chapter.  The Commissioner shall prepare and make available a form notice that satisfies the requirements of this Subsection (b).

(c)     All notices and postings that name individual Covered Employees shall comply with Section 1-25-040.

**1-25-100  Retaliation prohibited.**

(a)     It shall be unlawful for any Employer to discriminate in any manner or take any adverse action against any Covered Employee in retaliation for exercising any right under this Chapter, including, but not limited to, disclosing, reporting, or testifying about any violation of this Chapter or rules promulgated thereunder. For purposes of this Section, prohibited adverse actions include, but are not limited to, termination, denial of promotion, negative evaluations, punitive schedule changes, punitive decreases in the desirability of work assignments, and other acts of harassment shown to be linked to such exercise of rights.

(b)     A violation of this section shall subject the Employer to a $1,000.00 fine.

**1-25-110  Avoidance of Application.**

It shall be unlawful for an Employer to engage in any of the following to avoid coverage under this Chapter: (i) change a regular rate of pay, (ii) interfere with, restrain, deny, or change scheduled work days or hours, or (iii) hire, rehire, terminate, or suspend, even temporarily.

**1-25-120  Enforcement – Rules.**

The Department shall administer and enforce this Chapter and is authorized to adopt rules to effectuate that administration and enforcement.

**1-25-130  Violation – Penalty.**

Any Employer who violates this Chapter or any rule promulgated thereunder shall be subject to a fine of not less than $300.00 nor more than $500.00 for each offense.  Each Covered Employee whose rights are affected shall constitute a separate and distinct offense to which a separate fine shall apply.  Each day that a violation occurs shall constitute a separate and distinct offense to which a separate fine shall apply.  Any agreement between the Employee and Employer that would violate this Chapter is no defense to an enforcement action.

**1-25-140  Private cause of action.**

(a)      An employee may initiate a civil action asserting that they were subjected to a violation of this Chapter after the following sequence of events occurs: (i) the employee submits to the Department a factually supported written complaint describing the violation, and (ii) the Department forwards to the Employer the complaint and provides the Employer with an opportunity to either contest the alleged violation, in which case the Employer shall provide to the Department factual support for its position, or cure the alleged violation, in which case the Employer shall provide the Department with detail as to actions it has taken and will take to make the affected employee(s) whole and eliminate the basis for future similar complaints, and (iii) the Department has notified the complaining employee and the Employer in writing that the Department considers the complaint to be closed.  The Department may consider a complaint closed because: the complaint has been cured by the Employer, or the Department has deemed the complaint justified and supported and has enforced it against the Employer to conclusion, or the Department has deemed the complaint unjustified or unsupported.

(b)      Any claim or action filed under this Chapter must be made within two years of the alleged conduct resulting in the complaint.

(c)      A Covered Employee who prevails in a civil action pursuant to this section shall be entitled to an award of compensation for any damages sustained, including the payment of Predictability Pay unlawfully withheld, as a result of the violation, including litigation costs, expert witness fees, and reasonable attorney's fees.

**1-25-150  Non-exclusive Remedy.**

The remedies, fines, and procedures provided under this Chapter are cumulative and are not intended to be exclusive of any other available remedies, penalties, and procedures established by law which may be pursued to address violations of this Chapter.


**1-25-160  Retention of Records.**

Each Employer shall maintain for at least three years, or for the duration of any claim, civil action, or investigation pending pursuant to this Chapter, whichever is longer, a record of each Covered Employee's name, hours worked, pay rate, and records necessary to demonstrate compliance with this Chapter, including but not limited to good faith estimates of Work Schedules, initial posted schedule and all subsequent changes to that schedule, consent to work hours where such consent is required by this Chapter, and documentation of offers of hours of work to existing staff and responses to such offers.  Each Employer shall provide each Covered Employee a copy of the records relating to such Covered Employee upon the Covered Employee's reasonable request.


**1-25-170  Access to Work Site.**

Each Employer shall permit access to work sites and relevant records for authorized City representatives for the purpose of monitoring compliance with this Chapter and investigating Employee complaints of noncompliance, including production for inspection and copying of its employment records.


SECTION 2.  The Commissioner shall study the effectiveness of this Chapter and submit a report to the City Council by September 30, 2021.  The report shall include, but not be limited to, the economic impact of this Chapter and an assessment of whether the employee protections of this Chapter are adequate or should be strengthened or expanded in any area, with a special focus on whether Employers are engaging in practices to avoid conferring full-time status on their existing part-time Covered Employees.  In order to ensure a meaningful, data-driven, robust report, the Commissioner: (i) shall solicit pertinent information from Employers, Covered Employees and other stakeholders, including information bearing on the economic impact of this Chapter, and (ii) may engage professionals to assist with research, analysis and report preparation, subject to the availability of duly appropriated funds.


SECTION 3.  Section 2-25-200 of the Municipal Code of Chicago is hereby amended by adding the text underlined and deleting the text stricken as follows:

**2-25-200  Office of Labor Standards.**

(a)   *Definitions.* As used in this section:

"Chapter 1-24" means Chapter 1-24 of the Municipal Code of Chicago.

"Chapter 1-25" means Chapter 1-25 of the Municipal Code of Chicago.

"Commissioner" means the Commissioner of Business Affairs and Consumer Protection or the Commissioner's designee.

"Covered employee" has the meaning ascribed to that term in Section 1-24-010 or 1-25-020, as appropriate.

"Department" means the Department of Business Affairs and Consumer Protection.

"Director" means the Director of the Office of Labor Standards or the Director's designee within the Office of Labor Standards.

"Office" means the Office of Labor Standards established pursuant to subsection (b) of this section.

(b)   *Office of Labor Standards – Establishment – Powers and duties.* There is hereby established within the Department of Business Affairs and Consumer Protection an office of the municipal government, which shall be known as the Office of Labor Standards. Such Office shall include a Director, who shall be appointed by the Commissioner, and such other assistants and employees as provided for in the annual appropriation ordinance. The duties of the Office of Labor Standards, and of its Director, shall be to:

*(Omitted text is unaffected by this ordinance)*

(6)   Administer and enforce Chapters 1-24 and 1-25 of this Code;

*(Omitted text is unaffected by this ordinance)*

(c)   *Director – Duties pertaining to Chapters 1-24 and 1-25.* In connection with subsection (b)(6) of this section, the Director, consistent with the requirements of due process of law and in accordance with rules duly promulgated by the Commissioner, is authorized to: (i) receive complaints, which shall be filed by an employee or other person on behalf of an employee, of alleged violations; (ii) mediate disputes in connection with such complaints, if appropriate; (iii) investigate such complaints, as appropriate, and make findings of fact in connection with such investigations; (iv) issue notices of violation, as appropriate, if, following an investigation, the Director determines that there is reasonable cause to believe that a violation has occurred; (v) provide for a hearing following the issuance of any such notice of violation; (vi) conduct hearings; (vii) administer oaths, take testimony, issue subpoenas, and receive evidence in connection with such investigations or hearings; and (viii) otherwise enforce Chapters 1-24 and 1-25. Any investigation conducted pursuant to this section shall be conducted in a fair and impartial manner. The name and other identifying information of the employee or person reporting a violation of Chapters 1-24 and 1-25 shall be kept confidential to the extent permitted by law unless such employee or person authorizes the Director in writing to disclose this information as the Director deems necessary or appropriate to enforce this section. The Director may investigate complaints in cases where the complainant is unknown or anonymous.

(d)  *Director – Recordkeeping and reporting – Required.* No later than March 15, 2020, and on or before each March 15 thereafter, the Director shall post on the City of Chicago Office of Labor Standards website the following information pertaining to enforcement of Chapter 1-24 and Section 4-4-320 (a)(1), (a)(3), and (b)(1), and Chapter 1-25, though for Chapter 1-25 the first posting date shall be March 15, 2021:

(1)  Number of complaints received by the Office alleging violations of Chapters 1-24 and 1-25;

(2)  Number of investigations opened by the Office in connection with alleged violations of Chapters 1-24 and 1-25;

(3)  Number of employers cited for violations of Chapters 1-24 and 1-25;

(4)  Results of each enforcement action initiated under Chapters 1-24 and 1-25;

*(Omitted text is unaffected by this ordinance)*

**SECTION 4.** Following due passage and publication, this ordinance shall be in full force and effect on July 1, 2020, except with regard to Safety-net hospitals, for which the ordinance will go into effect on January 1, 2021. "Safety-net hospital" shall have the definition applied to that term in 305 ILCS 5/5-5e.1.

_____

Susan Sadlowski-Garza
Alderwoman, 10th Ward

_____

Michael D Rodriguez
Alderman, 22nd Ward