UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BUILDING OWNERS AND MANAGERS ASSOCIATION OF CHICAGO, <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF CHICAGO, <br><br> Defendant. | No. 19 CV 7212 <br><br> Judge Thomas M. Durkin |

## MEMORANDUM OPINION AND ORDER

Plaintiff Building Owners and Managers Association of Chicago ("BOMA") filed this action seeking a declaration that the Chicago Fair Workweek Ordinance is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, violates the equal protection clauses of the Illinois and United States constitutions, and violates the City of Chicago's (the "City") home rule authority. R. 1. The City moved to dismiss BOMA's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. R. 17. For the following reasons, that motion is granted.

## Legal Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). This

standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting Iqbal, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Background

In July 2019, the Chicago City Council joined a growing number of states and municipalities that have enacted so-called "predictive scheduling" laws, passing the Chicago Fair Workweek Ordinance to regulate employment scheduling practices in certain industries (the "Ordinance").[1] *See* R. 1 ¶ 11. The Ordinance generally provides that beginning in July 2020, employers within covered industries must (among other things): provide covered employees with an estimate of projected days and hours of work for the first ninety days of employment; give employees at least ten days'

---

[1] Similar laws have been passed in Oregon, as well as in New York City, Philadelphia, San Francisco, and Seattle.

advance notice of their work schedule (increasing to fourteen days' notice beginning in July 2022); allow employees to decline any previously unscheduled hours the employer adds to the schedule after that notice deadline; and, if the employer alters the schedule after the notice deadline, provide the affected employees with additional compensation (with certain exceptions). *Id.* ¶¶ 24, 25 (citing Ordinance §§ 1-25-040(b), 1-25-050(a)-(b)). The Ordinance also prohibits an employer from retaliating against an employee for exercising his or her rights under the Ordinance and provides employees with a private cause of action. *Id.* ¶¶ 28, 29 (citing Ordinance §§ 1-25-100(a)-(b), 1-25-140). But its requirements are waivable if the employer and any union expressly agree in a collective bargaining agreement not to apply the Ordinance's terms ("Opt-Out Provision"). *See id.* ¶ 30 ("if the waiver is set forth explicitly . . . in clear and unambiguous terms" in a collective bargaining agreement) (quoting Ordinance § 1-25-030).

Generally speaking, the Ordinance applies to employers with 100 or more employees, or at least 250 employees in the case of a non-profit organization, that are engaged in the following seven industries: building services; healthcare; hotels; manufacturing; restaurants; retail; and warehouse services. *Id.* ¶ 12 (citing Ordinance § 1-25-020). Covered employees are those who: (1) earn $26.00 an hour or less (if paid hourly) or $50,000 per year or less (if paid on a salary basis); and (2) spend the majority of their work time in Chicago. *Id.*

BOMA is a not-for-profit association representing the interests of Chicago office building owners and managers, as well as companies that provide janitorial,

security, and other building services to office buildings in Chicago. *Id*. ¶ 8. BOMA represents its members in multi-employer collective bargaining negotiations with labor unions that in turn represent its members' employees. *Id*. ¶ 31. These negotiations generally result in collective bargaining agreements that are three years in duration. *Id*. One such collective bargaining agreement is set to expire this Spring, a second will expire in Spring 2022, and a third will expire in Spring 2023. *Id*. ¶ 33.

BOMA's complaint seeks a declaratory judgment that the Ordinance: (1) is preempted by the NLRA (Count I); (2) violates the federal and Illinois equal protection clauses (Counts II and III); and (3) violates the City's home rule authority (Count IV). *See generally id.* The City moves to dismiss the complaint in its entirety for failure to state a claim. The Court considers the parties' arguments on each count in turn below.

## Analysis

## I.    Preemption (Count I)

Count I alleges that the Ordinance is preempted by the NLRA. *Id*. ¶ 46. The NLRA does not contain an express preemption provision, but the Supreme Court has recognized two forms of implicit preemption: (1) *Machinists* preemption; and (2) *Garmon* preemption. *See Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm'n*, 427 U.S. 132 (1976); *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959). BOMA's complaint alleges that both apply, while the City maintains that neither applies. *See* R. 18-1 at 8. The Court takes each in turn.

*Machinist Preemption.* The *Machinists* preemption doctrine forbids the regulation of "conduct that Congress intended 'be unregulated [and] left to be controlled by the free play of economic forces.'" *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 65 (2008) (quoting *Machinists*, 427 U.S. at 140). It prevents interference with the "economic weapons of self-help" that parties to a labor dispute may use in the bargaining process, such as strikes or lock-outs. *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 615 (1986); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20 (1987). However, states nevertheless "possess broad authority under their police powers to regulate employment relationships to protect workers," including by way of example through "[c]hild labor laws, minimum and other wage laws, [and] laws affecting occupational health and safety." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). Indeed, "the establishment of labor standards falls within the traditional police power of the State." *Fort Halifax*, 482 U.S. at 21. Accordingly, a law that merely "establishes a minimum labor standard that does not interfere with collective bargaining" is not preempted. *520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1129 (7th Cir. 2008). In short, preemption in this area "should not be lightly inferred." *Fort Halifax*, 482 U.S. at 21. The United States Supreme Court has held that a minimum labor standard is a law that: (1) affects union and nonunion employees equally; and (2) neither encourages nor discourages collective bargaining. *See Id.* at 20; *Metro. Life*, 471 U.S. at 753-55.

According to BOMA, the Ordinance fails under this test. First, BOMA contends that the Ordinance is not a minimum labor standard because it applies to only a small

5

segment of the working population, and thus is not a "law of general application" of the type the Seventh Circuit would allow. R. 28 at 8-11. BOMA relies exclusively on the Seventh Circuit's decision in *Shannon*. But that case is easily distinguished. There, an Illinois law known as the One Day Rest in Seven Act broadly applied to covered employees and employers throughout the state, regulating meal and rest breaks. 549 F.3d at 1121-22. At issue was an amendment to the Act that provided greater protections to certain covered employees. Ultimately, the court concluded that the amendment was preempted under *Machinists* in large part because it applied "to only one occupation (room attendants), in one industry (the hotel industry), in one county (Cook county)." *Id.* at 1130. As such, it was too narrow to be considered a law of general application. *Id.* at 1132.

In contrast, the Ordinance applies to the entire area over which the City has power to legislate, and concerns many types of workers across seven relatively broadly defined industries. It is broader in application than other laws that passed muster under *Machinists*, many of which applied to just one industry. *See, e.g., Am. Hotel and Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 960 (9th Cir. 2016) (applying only to hotel workers); *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 80 (2d Cir. 2015) (home health care providers); *Rhode Island Hospitality Assoc. v. City of Providence*, 667 F.3d 17, 32 (1st Cir. 2011) (hospitality industry).

BOMA nevertheless urges the Court to consider the number of Chicago workers the Ordinance actually covers, which it contends is minimal. According to BOMA, certain statistics show that a small percentage of the workforce is engaged in

the affected industries, and even those numbers, BOMA argues, are inflated because they do not account for the Ordinance's limitations concerning employer size and employee pay. R. 28 at 9-10. But the Court agrees with the City that a test depending on numbers or percentages would be unworkable, even if it were the standard (which it is not). Indeed, BOMA fails to point the Court to a single case that relied on such estimates. And rightly so; the number of workers employed in the industries at issue undoubtedly shifts based on many factors, including by way of present example the ongoing COVID-19 pandemic.[2]

Nor is the Court convinced by BOMA's argument regarding industries the Ordinance does *not* affect. BOMA does not allege or argue that the industries it identifies suffer from late scheduling changes, and the Court cannot fathom how they would. *See* R. 28 at 9-10 (citing "other large, lower-wage industries" not encompassed by the ordinance such as education, transportation, office and administrative support). The Court also is not troubled by the fact that the Ordinance applies only to employers with over 100 employees. That limitation is well within the bounds of laws that have survived *Machinists. See, e.g.*, *Fort Halifax*, 482 U.S. 1 (upholding law applicable to plant closings in which at least 100 employees were on the payroll at the affected plant).

BOMA also complains that the Ordinance provides substantive protections around issues that might otherwise be subject to collective bargaining. But as the

---

[2] Further, BOMA's estimates are inaccurate in any case, because they concern the percentage of employees who work in the Chicago region, rather than Chicago proper.

court in *Shannon* stated, "a state law is not preempted by the NLRA merely because it regulates a mandatory subject of bargaining." 549 F.3d at 1128; *see also Metro. Life*, 471 U.S. at 757 (a court "cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States"). Indeed, "[b]oth employers and employees come to the bargaining table with rights under state law that form a 'backdrop' for their negotiations." *Fort Halifax*, 482 U.S. at 21. Or as the *Shannon* court put it, laws that serve as a "floor." 549 F.3d at 1134. And those laws are valid provided they do not "favor or disfavor collective bargaining, eliminate particular bargaining tools, or dictate the details of particular contractual negotiations." *Concerned Home Care Providers*, 783 F.3d at 86.

BOMA next argues that the Ordinance is too "strict" and "burdensome" to be a minimal labor standard, again pointing to *Shannon*. R. 28 at 11-12. But the Court does not perceive this to be the case, and nor do BOMA's arguments convince it otherwise. Indeed, while the Ordinance undoubtedly places some burden on BOMA's members and the other employers it affects, a law is not preempted simply because it requires employers to adjust their practices. And the Ordinance compares favorably to the amendment at issue in *Shannon*, which, as explained, altered a set of common, already-implemented baseline break requirements established by the One Day Rest in Seven Act, but only with respect to certain workers in a single industry and county. In other words, the One Day Rest in Seven Act had established the minimum labor

standard, and the amendment at issue was "extra." In contrast, here the Ordinance *is* the baseline, and for a much broader segment of the workforce.

Nor does the Court find the Ordinance's requirements to be any more burdensome than other laws implementing labor standards that have passed muster under *Machinists*. *See, e.g.*, *Metro. Life*, 471 U.S. at 758 (concerning health care benefits); *see also Fort Halifax*, 482 U.S. at 22 (concerning severance pay arrangements). And any burden on BOMA's members is lessened significantly because: (1) they have been on notice of the Ordinance since at least August 2019, when it was passed; (2) the Ordinance did not become effective until July 1, 2020; and (3) the soonest any of its members' collective bargaining agreements will expire is Spring 2021. In short, BOMA's members have had—and still have—plenty of time to adjust their practices to the Ordinance's requirements.

Next, BOMA complains that the Ordinance's enforcement scheme "encourages litigation" because it creates a private right of action and makes attorneys' fees and costs available, again pointing to *Shannon*. But the court's focus in *Shannon* was not on the availability of attorneys' fees and costs. Instead, the court emphasized the amendment's treble damages provision and presumption of retaliation that shifted the burden of proof indefinitely to the employer—something the baseline One Day Rest in Seven Act applicable to Illinois's remaining 101 counties did not do. 549 F.3d at 1134-35, 1137. Further, the Court agrees with the City that the Ordinance actually discourages litigation to the extent it requires employees to pursue informal dispute resolution before filing suit. *See* Ordinance § 1-25-140 (requiring employees to first

bring issues before the City's Department of Business Affairs and Consumer Protection).

BOMA next claims that the Ordinance cannot be a minimum labor standard because it is a result of "powerful unions representing the interest of employees in Covered Industries," and encourages "interest group lobbying," much like the amendment in *Shannon*. R. 28 at 10-11. But the court in *Shannon* emphasized the amendment's narrow scope—both in terms of geography (one county) and the employees covered (comprising what the court called a single bargaining unit)—and the broadly applicable requirements the One Day in Seven Act already established for numerous other bargaining units and the rest of the state. *Id.* at 1132-34. As discussed, the Ordinance is far broader in application and *is* the baseline. And BOMA offers no meaningful argument that any industry the Ordinance does not cover is afflicted by the same scheduling issues as those that are.

Finally, BOMA argues that the Ordinance is preempted because it forces parties to a collective bargaining agreement to "negotiate as to specific substantive conditions," much like the law at issue in *Cannon v. Edgar*, 33 F.3d 880 (7th Cir. 1994). R. 28 at 12. But that law *required* bargaining; indeed, gravedigger unions and cemetery employers were directed to negotiate and agree by a certain date to the creation of a labor pool of gravediggers who could perform burials during labor disputes. *Cannon*, 33 F.3d at 885. The law even required the parties to agree on the members of that pool, or face sanctions. *Id.* In contrast, the Ordinance merely provides parties to a collective bargaining agreement with the *option* to negotiate out

of its strictures. And despite BOMA's urging to the contrary, the Ordinance's Opt-Out Provision does not impermissibly interfere with bargaining, either. To hold otherwise would run contrary to *Fort Halifax*, in which the Supreme Court upheld a law concerning severance pay that, like the Ordinance, allowed parties to a collective bargaining agreement to reach their own arrangements on the issues. 482 U.S. at 22. As the Court in *Fort Halifax* explained, "[t]he fact that the parties are free to devise their own severance pay arrangements . . . strengthens the case that the statute works no intrusion on collective bargaining [because the State] has sought to balance the desirability of a particular substantive labor standard against the right of self-determination regarding the terms and conditions of employment."[3] *Id.*

In sum, the Ordinance establishes minimum labor standards that do not impermissibly impact bargaining. *Machinists* preemption does not apply.

**Garmon Preemption.** For similar reasons, *Garmon* preemption also does not apply. *Garmon* preemption prohibits the regulation of activity the NLRA arguably protects or prohibits. *Garmon*, 359 U.S. at 244-45. It "seeks to prevent conflicts between state and local regulation and Congress's integrated scheme of regulation embodied in Section 7 and 8 of the NLRA," and maintains the National Labor Relations Board's primary jurisdiction in cases involving those sections. *Shannon*,

---

[3] The Seventh Circuit highlighted this very language in *Shannon*, distinguishing between such a law from the amendment there, under which the parties to a collective bargaining agreement "[we]re not free to devise their own arrangement," thereby "intrud[ing] on the collective bargaining process." 549 F.3d at 1134. And the court held that this was particularly problematic because the One Day Rest in Seven Act that the law at issue amended did allow for such bargaining. *Id.*

549 F.3d at 1125. Of relevance here, Section 7 of the NLRA protects an employee's right to: (1) form or join a labor union; (2) collectively bargain through a representative of the employee's choosing; and (3) engage in concerted activity, e.g., striking or picketing. *See* 29 U.S.C. § 157. Section 7 also generally protects an employee's right to refrain from engaging in these activities.

BOMA alleges that the Ordinance is preempted under *Garmon* because it interferes with the second of these rights; that is, an employee's right to collectively bargain. According to BOMA, "the Ordinance purports to regulate particular terms of the bargaining process, including work schedule, hours, and rest"—terms BOMA contends are traditionally left to the bargaining process. R. 28 at 21. BOMA again points to *Cannon* in support. But the problem in *Cannon* was not that the law at issue addressed subjects that typically arose in bargaining, but rather, and as discussed, that the law went so far as to "require the parties to actually agree on a particular pool of workers [by a certain date] or face sanctions at the hands of the Illinois courts." 33 F.3d at 884. In contrast, the Ordinance does not require parties to come to any agreement at all; as mentioned, the Ordinance's Opt-Out Provision allows them to agree to waive the Ordinance's provisions altogether. As such, *Garmon* preemption does not apply, and Count I is dismissed.

## II.    Equal Protection (Counts II and III)

Counts II and III of BOMA's complaint allege that the Ordinance violates the equal protection clauses of the United States and Illinois constitutions (respectively) because the Ordinance only applies to employers in certain industries with

workforces of a certain size and composition, and then only to those who did not opt out by negotiating a waiver of the Ordinance's terms via the Opt-Out Provision.[4] The City contends that both counts should be dismissed because there are several rational reasons to support these classifications, and the complaint fails to allege otherwise. BOMA concedes that rational basis review applies, but argues that the equal protection claims survive because the complaint need only allege that the Ordinance treats certain employers differently than others with no rational basis for the difference (and it does). R. 26 at 18.

The rational basis standard "sets the legal bar low and simply requires 'a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (quoting *Srail v. Vill. of Lisle, Ill.,* 588 F.3d 940, 946 (7th Cir. 2009)). "[T]he State need not articulate its reasoning at the moment a particular decision is made." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001). Instead, the burden is upon the challenging party to negate "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* Accordingly, to survive a Rule 12(b)(6) motion to dismiss in this context, "a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Wroblewski v. City of Washburn,* 965 F.2d 452, 460 (7th Cir. 1992).

_____

[4] The equal protection clause of the Fourteenth Amendment to the United States Constitution guarantees that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Illinois Constitution similarly provides that "[n]o person shall . . . be denied the equal protection of the laws." Ill. Const., art. I, § 2

BOMA's complaint alleges that the Ordinance:

> arbitrarily, unfairly, and without rational basis distinguishes "Employers" subject to the Ordinance from other classes of employers based on the number and types of employees they have and the industries they are primarily engaged in . . . while excusing all other classes of employers from the same obligations.

R. 1 ¶¶ 49, 54. And the complaint further alleges that the Ordinance:

> arbitrarily, unfairly and without rational basis classifies which of the class of "Employers" subject to the Ordinance shall be subject to and which shall be exempt from obligations under the Ordinance based upon such employers' willingness or agreement to enter into collective bargaining agreements with labor organizations.

*Id.* ¶¶ 50, 55. BOMA argues that this is sufficient under *Wroblewski*. But the complaint's conclusory allegations are plainly insufficient to survive the City's motion, and *Wroblewski* makes that clear. Indeed, *Wroblewski* specifically held that "[t]he complaint's conclusory assertion that the policy is 'without rational basis' is insufficient to overcome the presumption of rationality coupled with the readily apparent justification for the policy." 965 F.2d at 460; *see also Zajicek v. Aaby*, 77 F.3d 485 (7th Cir. 1996) ("[A] plaintiff who alleges the irrationality of legislation in an equal protection claim cannot survive a motion to dismiss by making conclusory allegations of irrationality in his complaint.").

As in *Wroblewski*, here, several justifications for the Ordinance's classifications are "readily apparent." First, the Court agrees with the City that limiting the Ordinance to larger employers is appropriate because they are better able to absorb the costs of the regulations, and because their practices have an impact on a greater

number of Chicagoans and their families as well as the City's economy more generally. BOMA does not argue otherwise.[5]

There also are rational reasons to restrict the application of the Ordinance to certain industries, including because the demand for employees working in those industries is likely to fluctuate. And there similarly are rational reasons to restrict its application to employees making less than $50,000 a year or $26.00 per hour, given the potentially serious economic and personal impacts a late schedule change could have on them over others with more income. That is especially so because such employees may hold multiple jobs.

Despite BOMA's urging to the contrary, it does not matter that the types and sizes of businesses and classifications of employees impacted by the Ordinance result from imperfectly drawn lines. *See Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (there is no equal protection violation "merely because the classifications [ ] are imperfect"). Indeed, "[d]efining the class of persons subject to a regulatory requirement" is an "unavoidable component[ ] of most economic legislation." *Beach*, 508 U.S. at 315-16. In short, legislatures must "draw the line somewhere." *Id.* It likewise is of no import that the "City offers no explanation as to how or why it selected and defined the seven specific industries it did," or that "there is no indication in the Ordinance's legislative record that the City conducted any rational

---

[5] As the City notes, federal workplace regulations exempting smaller employers are commonplace. *See* R. 18-1 at 11-12 (citing, e.g., Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, and the Patient Protection and Affordable Care Act).

analysis in arriving at the industries it selected" as BOMA complains. R. 28 at 19. Again, it is *BOMA's* burden to negate the possibility of a rational basis for the City's line-drawing, and while "[t]he fourteenth amendment requires a rational relationship to a legitimate state purpose, . . . it does not require that the legislature spell out its reasoning." *Maguire v. Thompson*, 957 F.2d 374, 378 (7th Cir. 1992) (citing *U.S. RR. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).

Lastly, the Ordinance's Opt-Out Provision, which allows the parties to a collective bargaining agreement to waive the Ordinance's requirements, does not run afoul of equal protection concerns either. To the contrary, the Court agrees with the City that it is rational to exclude workers from the Ordinance's protections who "have the ability, through their collective bargaining agreement, to secure sufficiently protective terms governing scheduling and wages." R. 18-1 at 13. BOMA offers no argument to the contrary.

In short, the City offers a number of possible reasons to support the Ordinance's classifications, and the Court concludes that they are rational. BOMA has not—and likely cannot—negate them. Counts II and III are dismissed.

## III. Home Rule Authority (Count IV)

Finally, Count IV alleges that the Ordinance is not a valid exercise of the City's home rule authority under Article VII, Section 6 of the Illinois Constitution because: (1) the regulation of employment terms and conditions is a matter of statewide—not local—concern; and (2) it creates a private right of action in state court allowing for

damages and the recovery of litigation costs and expert and attorneys' fees. The Court takes each contention in turn.

**State or local concern.** The Illinois Constitution provides that a home rule municipality like the City may, "[e]xcept as [otherwise] limited by this Section:"

> exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare[.]

Ill. Const., art. VII § 6(a). It directs that the "powers and functions of home rule units shall be construed liberally." *Id.* § 6(m). As such, home rule units are given the "broadest powers possible" to regulate matters of local concern. *Scadron v. City of Des Plaines*, 606 N.E.2d 1154, 1158 (Ill. 1992). Courts generally evaluate three factors in determining whether a subject is a matter of local concern for these purposes. Specifically: "(1) the nature and extent of the problem, (2) the units of government which have the most vital interest in its solution, and (3) the role traditionally played by local and statewide authorities in dealing with it." *Kalodimos v. Vill. of Morton Grove*, 103 Ill.2d 483, 501 (Ill. 1984).

As to the first factor, the City contends that the Ordinance addresses matters of local concern; that is, fair scheduling practices for the "working people of Chicago" so they can "attend to their families, health, and education, and other obligations." Ordinance § 1-25-010. The City points out that the Ordinance applies only to employees who spend a majority of their work time physically in Chicago, and specifically requires the City's Department of Business Affairs and Consumer Protection to study its effectiveness so that it can be tailored further to local needs.

17

R. 28 at *Id.* §§ 1-25-020, 1-25-170. BOMA offers no response. Accordingly, and because the City's arguments have support in any event, this factor weighs in favor of concluding that the Ordinance is a proper exercise of home rule authority. *See, e.g.,* *Bremen Cmty. H.S. Dist. No. 228 v. Cook Cnty. Comm'n on Human Rights*, 981 N.E.2d 369, 381 (Ill. App. Ct. 2012) (county ordinance prohibiting discrimination as to employment that is in whole or in part in Cook County or discrimination that takes place in Cook County "pertains to the County's government and affairs" and was a proper exercise of home rule authority).

As to the second factor, the City contends that as Illinois's most populous municipality with the most employers and employees in the covered industries, it is the unit of government with the most vital interest in addressing work schedule uncertainty. R. 18-1 at 16. In response, BOMA contends that Illinois has a more vital interest in predictive scheduling than the City because City workers' "average wages are undoubtedly higher than average wages across the state or country." R. 28 at 21. The Court is not persuaded; Chicago wages may be higher, but so too is the cost of living. Accordingly, and because BOMA does not respond to the City's representation that it houses the most employers and employees in the covered industries, the second factor also weighs in favor of concluding that the Ordinance was a proper exercise of the City's home rule authority.

Finally, the City contends that the third factor also favors upholding the Ordinance, because: (1) "local governments have traditionally played a central role in addressing employee benefits and other employment terms;" and (2) the Illinois

General Assembly "has not expressed any vital interest or traditionally exclusive role in the area of predictive scheduling." R. 18-1 at 16-17. The City points to several cases in which Illinois courts have upheld local legislation as to employee welfare and benefits, and notes that the State has not enacted any legislation in the predictive scheduling area. *See id.* (citing *Crawford v. City of Chi.*, 710 N.E.2d 91, 99-100 (Ill. App. Ct. 1999) (health benefits for employee's domestic partner); *Bremen*, 981 N.E.2d at 381 (employment discrimination); *Page v. City of Chi.*, 299 Ill. App. 3d 450, 459 (Ill. App. Ct. 1998) (employment discrimination)). BOMA offers no response.

In sum, the Ordinance applies on a local scale to address a problem felt most acutely in Chicago. It is aimed at ensuring the welfare of some of the City's most vulnerable citizens. Accordingly, the Ordinance is related to the City's government and affairs and a proper exercise of its broad home rule authority.

***Private right of action.*** As discussed, the complaint also alleges that the Ordinance's creation of a private right of action violates the City's home rule authority because it imposes a burden on Illinois's court system. In response, the City contends that BOMA has no standing to challenge the Ordinance's private right of action provision, and that its argument fails on the merits in any case.

Generally speaking, a plaintiff lacks standing to sue over a private right of action provision when the only defendant is a governmental entity. *See Hope Clinic v. Ryan*, 249 F.3d 603, 604 (7th Cir. 2001). This is so both because the defendant "cannot cause the plaintiffs injury by enforcing the private-action statutes," and "any potential dispute plaintiffs may have with future private plaintiffs could not be

19

redressed by an injunction running only against public prosecutors." *Id.* Indeed, "[b]oth causation and redressability are essential to an Article III controversy." *Id.* Nevertheless, BOMA contends that it does have standing because unlike the government officials in *Hope Clinic*, the City has "some connection" to enforcement of the Ordinance, because it provides for City enforcement of specific penalties for violations, and requires certain steps be taken before the City's Department of Business Affairs and Consumer Protection before an individual may bring suit. R. 28 at 21-22. BOMA cites two district court cases in other Circuits in support of its argument. *See id.* (citing *Doe v. Piper*, 165 F. Supp. 3d 789, 801-02 (D. Minn. 2016) and *Little Rock Family Planning Servs. v. Rutlege*, 397 F. Supp. 3d 1213, 1264 (E.D. Ark. 2019)). However, not only is neither case binding on this Court, but also *Hope Clinic* suggests that the City's "connection" may be insufficient to create standing here. Indeed, the partial birth abortion statutes at issue there allowed the government to prosecute criminal felonies for certain violations, and the court nevertheless found that the plaintiff lacked standing as to the defendant attorneys general. *See Hope Clinic v. Ryan*, 195 F.3d 857, 862-63 (7th Cir. 1999) (providing an overview of the partial birth abortion statues at issue).

But even setting aside the issue of standing, BOMA's argument that the Ordinance's private right of action provision imposes an "impermissible burden on state courts" still fails. At the outset, the Court rejects any contention that a home rule unit may not establish a private right of action as a general matter. Again, the Illinois Constitution plainly indicates that a home rule unit's powers are to be

construed broadly. *See* Ill. Const., art. VII § 6(a) (indicating that "a home rule unit may exercise any powers or perform any functions pertaining to its government affairs" except to the extent Section 6 dictates otherwise); *see also id.* § 6(m) (stating that a home rule unit's powers are to be "construed liberally"). And while it places limits on certain powers, it says nothing to indicate that the creation of a private right of action is never permissible. *See, e.g.*, *id.* § 6(d)(2) (indicating that a home rule unit has no power to "define and provide for the punishment of a felony"); *id.* § 6(e) (a home rule unit has no power to punish by imprisonment for more than 6 months unless the Illinois legislatures allows it).

Moreover, and consistent with the Court's reading, the Illinois Supreme Court in *City of Chicago v. Roman* upheld a City ordinance that: (1) imposed a mandatory prison term of less than six months for an offense; and (2) gave the City the ability to enforce that penalty in state court. 184 Ill.2d 504, 513-15 (Ill. 1998). In so doing, the court expressly pointed out the breadth of the City's powers under Section 6 of the Illinois Constitution, and twice noted that "[t]he Illinois approach [to home rule] places almost exclusive reliance on the legislature rather than the courts to keep home rule units in line." *Id.* at 89, 90 (quoting *Scadron v. City of Des Plaines,* 606 N.E.2d 1154, 1164 (Ill. 1992) (internal citations omitted)).

And more recently, an Illinois appellate court rejected a home rule challenge to a City ordinance that, like the one at issue here, allowed private parties to recover attorneys' fees in civil suits seeking its enforcement. *Palm v. 2800 Lake Shore Drive Condo. Ass'n*, 929 N.E.2d 641 (Ill. App. Ct. 2010). The Illinois Supreme Court

subsequently affirmed that decision without calling into question the City's power to create the private right of action. *Palm v. 2800 lake Shore Drive Condo. Ass'n*, 988 N.E.2d 75 (Ill. 2013); *see also Abbasi v. Paraskevoulakos*, 718 N.E.2d 181, 190 (Ill. 1999) (Harrison, J., dissenting) (stating that if the majority had reached the issue on the merits, "it would be required to hold that an ordinance providing for a private right of action is a lawful exercise of home rule authority").

Nevertheless, BOMA complains that the City exceeded its home rule authority because the Ordinance's private right of action, two-year statute of limitations, and damages provisions "place[ ] an improper burden on the state judicial system." R. 28 at 22. But the Illinois Supreme Court in *City of Evanston v. Create, Inc.* held that a municipal ordinance that included similar provisions—defining "notice procedures, duties of the parties, and remedies available"—did not "interfere with [Illinios's] court system." 421 N.E.2d 196, 202-03 (Ill. 1981). Indeed, the court noted that "[c]ourts are regularly called upon to enforce or interpret municipal ordinances." *Id.* at 203.

And BOMA's cases are all distinguishable. Unlike here, two cases concerned ordinances that dictated rules of courtroom procedure. *See generally City of Carbondale v. Yehling*, 451 N.E.2d 837 (Ill. 1983) (dictating, among other things, timelines for hearings and notice thereof); *see also Paper Supply Co. v. City of Chi.*, 317 N.E.2d 3 (Ill. 1974) (directing courts to apply Illinois's Administrative Review Act to their proceedings concerning the ordinance at issue). Two other cases concerned ordinances that addressed matters which the Illinois Constitution left exclusively to the States, or which had been the subject of "comprehensive regulation by the State

22

for many years." *See McLorn v. City of E. St. Louis*, 434 N.E.2d 44, 46-48 (Ill. App. Ct. 1982) (declaring ordinance invalid as an improper attempt by a municipality to exercise sovereign immunity, a matter the Illinois Constitution left solely to the Illinois General Assembly); *People v. Valentine*, 365 N.E.2d 1082, 1085 (Ill. App. Ct. 1977) (deeming criminal identification and investigation "an integral part of the comprehensive law of Illinois dealing with criminal law and procedure," to which any local ordinance on the subject "must yield to the supremacy of State law"). Here, as BOMA concedes, there is no state law concerning predictive scheduling.

BOMA also relies on *Ampersand, Inc. v. Finley*, in which the court invalidated an ordinance because it directed the clerk to collect a $2 filing fee in civil cases to support a county law library, which created a "condition to the right to litigate in the courts." 338 N.E.2d 15, 18 (Ill. 1975). The Ordinance creates no similar condition. *See Create, Inc.*, 421 N.E.2d at 202-03 (declaring *Ampersand* "inapposite" because "[t]he Ordinance does not prevent either landlord or tenant from seeking relief in the courts of the State").

Finally, BOMA points to *Quela v. Payco-General American Credits, Inc.*, in which another court in this District invalidated a county ordinance that authorized a private right of action. 84 F. Supp. 2d 956, 959 (N.D. Ill. 2000). But the *Quela* court relied in part on the fact that the ordinance at issue attempted to "dictate procedures to the state judiciary." *Id.* And to the extent the decision in *Quela* was based on the more general premise that a municipality may not create a private right of action, as explained *supra*, this Court disagrees.

In sum, BOMA fails to state a claim that the Ordinance is an improper exercise of the City's home rule authority.

## Conclusion

For the foregoing reasons, the City's motion to dismiss is granted. R. 17. If BOMA believes that it can remedy the deficiencies identified in this opinion, it may move to amend its complaint by February 18, 2021. Any such motion shall be accompanied by a brief of no more than ten pages explaining how the amendments cure the deficiencies identified here. Absent such a timely motion, this dismissal will be with prejudice and this civil case terminated.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  January 19, 2021